# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **DARLA R. MOORE,** | } | |
| **Plaintiff,** | } } | |
| **v.** | } } | |
| **HUNTSVILLE REHABILITATION FOUNDATION, INC. d/b/a PHOENIX,** | } } } } } | **Case No.:  5:18-cv-02016-MHH** |
| **Defendant.** | | |

## MEMORANDUM OPINION

In this Title VII action, Darla Moore alleges that her employer, Phoenix, subjected her to a hostile work environment based on her sex and retaliated against her because she filed a charge of discrimination with the EEOC.[1]  Phoenix has asked

---

[1] Ms. Moore originally named Alexis Fitzsimmons as a defendant.  (Doc. 1, p. 2, ¶ B).  In her second amended complaint, Ms. Moore did not include claims against Ms. Fitzsimmons.  (Doc. 37, pp. 2–3, ¶¶ 5–7).  The Eleventh Circuit Court of Appeals has held that "[i]ndividual capacity suits under Title VII are . . . inappropriate" because "[t]he relief granted under Title VII is against the *employer*, not individual employees."  "[T]he proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly."  *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (citing *Clanton v. Orleans Parish Sch. Bd.*, 649 F.2d 1084, 1099 (5th Cir. 1981)) (emphasis in *Busby*).  Ms. Moore has properly named her employer as the Title VII defendant in this action.

1

the Court to enter judgment in its favor on Ms. Moore's claims. (Doc. 51). This opinion resolves Phoenix's motion for summary judgment.

The Court begins with an overview of the summary judgment standard. Then, the Court summarizes the summary judgment evidence, presenting the evidence in the light most favorable to Ms. Moore. Next, the Court addresses Phoenix's objection to some of Ms. Moore's summary judgment evidence. Finally, the Court evaluates the parties' evidence under the legal standards for hostile work environment and retaliation claims.

## I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact precluding summary judgment, the party opposing summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

"A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of certain evidence, the court cannot make credibility determinations; that is the work of jurors. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in the non-moving party's favor. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). Accordingly, the Court presents the summary judgment evidence in the light most favorable to Ms. Moore and draws all inferences in her favor.

Ms. Moore has submitted an affidavit in opposition to Phoenix's motion for summary judgment. (Doc. 58). Phoenix has asked the Court to strike most of the affidavit because "it is based on speculation, inadmissible hearsay, and contains several statements that are inconsistent with her deposition testimony." (Doc. 61, p. 2). Phoenix raised several related objections in its reply brief. (*See*, *e.g.*, Doc. 63,

p. 7). The Court construes Phoenix's motion to strike as an objection under Federal Rule of Civil Procedure 56(c)(2).[2] The Court addresses Phoenix's objection below.

## II.

Phoenix is a Huntsville, Alabama non-profit corporation. Phoenix "assist[s] people, primarily those with disabilities, to improve the quality of their lives." (Doc. 52-1, p. 3, ¶¶ 2–3). In December 2017, Phoenix hired Ms. Moore as a custodian. (Doc. 52-3, pp. 14, 34, tpp. 51, 132; Doc. 52-8, p. 3). Ms. Moore completed her probationary period of employment in April 2018. (Doc. 52-3, p. 21, tp. 80). During her probationary period, Ms. Moore worked on a custodial team with Alexis Fitzsimmons. (Doc. 52-3, p. 38, tp. 148). While they worked together, another Phoenix employee, Larry Toney, told Ms. Moore that Ms. Fitzsimmons had said to him that she (Ms. Fitzsimmons) liked Ms. Moore, she was interested in Ms. Moore, and she wanted to be with Ms. Moore sexually. (Doc. 52-3, pp. 39, 43, tpp. 149, 166). Ms. Moore told Ms. Fitzsimmons several times in January or February 2018

---

[2] Effective December 1, 2010, motions to strike summary judgment evidence no longer are appropriate. *See* FED. R. CIV. P. 56(c)(2) advisory committee note (2010 amendments) ("There is no need to make a separate motion to strike."); *Campbell v. Shinseki*, 546 Fed. Appx. 874, 879 (11th Cir. 2013) ("The plain meaning of [amended Rule 56(c)(2)] show[s] that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily.") (citing *Cutting Underwater Technologies USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 515 (5th Cir. 2012)). At the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). Accordingly, objections to evidence supporting or opposing a motion for summary judgment should be made in the objecting party's brief.

that she was heterosexual and celibate, hoping "she would never try to come at [her] . . . ." (Doc. 52-3, pp. 43–45, tpp. 167–74). While Ms. Fitzsimmons and Ms. Moore worked together, Ms. Fitzsimmons did not indicate to Ms. Moore that she was interested in her. (Doc. 52-3, p. 39, tpp. 149–50).

Before Ms. Moore finished her probationary period, she switched custodial teams. (Doc. 52-3, p. 39, tpp. 151, 153). Ms. Fitzsimmons became the crew lead of Ms. Moore's new team. (Doc. 52-3, p. 39, tpp. 151, 153). On Friday, June 8, 2018, Ms. Fitzsimmons told Ms. Moore that she had spoken to other co-workers about being attracted to her. (Doc. 52-3, p. 46, tpp. 178–80). The following Monday, Ms. Moore was sitting in a Phoenix van before her shift. (Doc. 52-3, pp. 46–47, tpp. 180–81; Doc. 57, p. 4, ¶ 12). Ms. Fitzsimmons "came to the van, and she opened -- swung open the van doors . . . [a]nd then out of the blue, she just turned around and she put her hand on [Ms. Moore's] ankle, under [Ms. Moore's] slacks, and [Ms. Moore] was like what the hell, and she just scurried away." (Doc. 52-3, p. 47, tp. 181). The next day, when Ms. Moore returned to a building after taking out the trash, Ms. Fitzsimmons "stopped right in front of [her], and she said ahhh" while touching Ms. Moore's breast. (Doc. 52-3, p. 47, tpp. 182–84).

Phoenix's employee handbook includes a policy that prohibits harassment. (Doc. 52-2, pp. 16–17). The policy states:

> It is the policy of [Phoenix] that all employees have a right to work in an environment free from discrimination, which encompasses freedom

5

from any form of harassment.  The company prohibits harassment of its employees based on race, sex, color, religion, national origin, age, disability, veteran status, or any other factor resulting in abusive, taunting, demeaning, or harassing behavior.  This includes the behavior of peers, superiors, subordinates, customers, and visitors to the premises.  Harassment by an employee of fellow employees, customers or visitors may result in disciplinary action up to and including dismissal of the employee.

Although it is not the only type prohibited, the most common form of harassment relates to sexual harassment.  Specifically, no supervisor may threaten or insinuate, either explicitly or implicitly, that an employee's submission to or rejection of sexual advances will in any way influence any personnel decision regarding that employee's employment, evaluation, wages, advancement, assigned duties, shifts, or any condition of employment or career development.

Other sexually harassing conduct in the workplace, whether physical or verbal, committed by supervisors, non-supervisory personnel, visitors, or customers is also prohibited.  This includes repeated offensive sexual flirtations, advances, propositions, continual or repeated verbal abuse of a sexual nature, graphic verbal commentaries about an individual's appearance, sexually degrading words used to describe an individual, the display of sexually suggestive objects, the display of inappropriate private cell phone images or pictures and any other inappropriate sexual related activity in the workplace.

Employees who believe they are being harassed in any way have a duty to report the harassment to the organization.  Employees should report harassment through their chain of supervision when possible.  If anyone in the employee's chain of supervision is involved in the harassment, the employee may report the harassment directly to the CEO or the COO.  Employees may also utilize the published grievance procedure to resolve a complaint of harassment.

(Doc. 52-2, p. 17).  Phoenix also has a grievance/conflict resolution policy.  It states:

It is the Policy of Phoenix to resolve problems at the lowest level of the organization with the minimum number of people involved.  Any employee who feels that they have a grievance or problem or that he or

6

she has been wronged in some way is required to follow the following procedure to address the issue.  It is assured that initiation of this process will not result in any form of retaliation or barrier to service.

Employees covered under a Collective Bargaining Agreement should follow the Negotiated Grievance Process as outlined in their respective Collective Bargaining Agreement.  All other employees should follow the procedures outlined below.

First, talk with your supervisor and attempt to work the problem out.  If the problem is with the supervisor, then go to the supervisor's supervisor.

Second, if your first step is not successful in resolving the problem, then make an appointment to speak with the next level supervisor.

Third, if the first two steps are not successful, then call or make an appointment to talk with the Human Resource department.

Fourth, if the problem is still not resolved, then put the problem in writing to the President/CEO of Phoenix.  At this point, the complaint becomes a formal grievance/appeal.  You will then be informed of the final decision or findings.

***

At each step, the supervisor (or individual with which the grievance is being filed) has a period of 14 business days to offer a resolution to the grievance.  Extenuating circumstances or special situations may warrant extending the 14 days to ensure due process is met.

Employees will not be subjected to retribution or other negative action for utilizing the grievance process to resolve a problem.

(Doc. 52-2, pp. 16–17).

On Friday, June 15, Ms. Moore complained in writing to Phoenix:

To Whom It May Concern:

7

I am being sexually harassed by Alexa [sic] Fitzsimmons.  I [sic] when I first started work, Mr. Tony [sic] warned me that Alexa was that [sic] she wanted me sexually.  In January or February of 2018, I took the initiative to tell Alexa, in a private conversation, when there was an opening to mention it, that I was heterosexual.  A couple weeks after I became a permanent employee, Alexa was moved to my team.  On June 8, 2018, Alexa told me that she had told other co-workers that she wanted to be with me sexually, and she started making open comments about being with me sexually.  I was shocked and speechless.  On June 11, 2018, Alexa put her hand on my ankle under my slacks.  I exclaimed loudly in protest, and she moved away from me.  After that, she acted like it had not happened.  There was no one else there to witness.

On Tuesday, June 12, 2018, I came in from the rain about 8:40 p.m. at the SAS daycare on Redstone arsenal.  My shirt was wet from the rain.. [sic]  I went into the cafeteria to put up my cart.  When I came through the kitchen door into the cafeteria, Alexa was coming through the eating area to go through the door into [the] kitchen.  When Alexa saw me, she said "Ahh," and while she was saying that, she reached out and touched me on my breast.  There was no one there to witness, but there were cameras nearby.  I am asking you to request to look at the SAS cameras, because they may have recorded her doing this.

I want her to stop sexually harassing me and touching me, immediately.  I think she has done this kind of thing before, because there is talk that she has been moved from other teams for this same behavior.  She is my lead, and I am in an extremely uncomfortable position complaining directly to her.  I do not want to complain to Roy or Ramos because they are men.  I do not want to work around her anymore.

(Doc. 52-4, p. 2).[3]

---

[3] An employer may be held liable for a hostile work environment if the employer "knew or should have known" of the harassment and failed to take prompt remedial action.  Evidence of pervasive harassment can establish constructive knowledge on the part of the employer.  *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982).  The Court reviewed the record and found no evidence to substantiate Ms. Moore's report of Ms. Fitzsimmons's purported history of harassing conduct.

Ms. Moore gave her June 15, 2018 written statement either to Phoenix's HR specialist Brikita Smith or to Phoenix's operations manager Christy Langford.[4] (Doc. 52-3, p. 41, tpp. 159–60).  "Ms. Fitzsimmons was placed on a different crew after Ms. Moore complained, and about a week after Ms. Moore's complaint, [Phoenix] placed Ms. Fitzsimmons on the day shift, so that Ms. Moore, who worked on the night shift, would not even be working on the same shift as Ms. Fitzsimmons. Ms. Moore and Ms. Fitzsimmons never again worked together after Ms. Moore submitted her complaint to Phoenix."  (Doc. 52-5, pp. 2–3, ¶ 3; *see also* Doc. 52-3, pp. 52–53, tpp. 204–05).

On June 22, 2018, one week after Ms. Moore's written statement, Ms. Moore met with operations manager Christy Langford, project manager David Franklin, and union representative Ron Hickman.  (Doc. 52-3, p. 49, tpp. 191–92; Doc. 64-1, p. 2, ¶ 3).  Ms. Moore testified that Mr. Franklin tried to get her to retract her complaint about Ms. Fitzsimmons's misconduct.  (Doc. 52-3, p. 49, tp. 192).  Ms. Langford, Mr. Franklin, and Mr. Hickman told Ms. Moore that Phoenix investigated her claims but could not corroborate her allegations against Ms. Fitzsimmons.  (Doc. 64-1, p. 2, ¶ 4; *see also* Doc. 52-5, p. 3, ¶¶ 3–5).  Ms. Moore asked Phoenix to obtain the security footage from the building where Ms. Fitzsimmons touched her, but when

---

[4] Ms. Smith is referred to as "Britika Smith" in Ms. Moore's deposition testimony, (Doc. 52-3, p. 41, tp. 159), but the parties refer to her as "Brikita Smith" in their submissions, (Doc. 53, p. 8, ¶ 33; Doc. 57, p. 4, ¶ 14).  The Court uses the spelling the parties use.

Ms. Langford requested it, security personnel told her "there was no footage for that time period because the cameras turn off each weekday at 6 p.m. and on the weekends . . . ." (Doc. 52-5, p. 3, ¶ 5).[5]

On June 25, 2018, Ms. Moore met with Ms. Langford, Ms. Smith, and Mr. Hickman. (Doc. 52-5, p. 3, ¶ 6). They "assured Ms. Moore that Phoenix wanted to ensure she had a safe work environment. [They] explained to Ms. Moore that she and Ms. Fitzsimmons would continue to work separate shifts. During this meeting, Ms. Smith asked Ms. Moore to write down anything Phoenix could do to make sure she had a safe work environment, and Ms. Moore stated she did not know." (Doc. 52-5, pp. 3–4, ¶ 6). Phoenix offered Ms. Moore the option of clocking in and out in a different building so that she could avoid Ms. Fitzsimmons. (Doc. 52-3, p. 53, tp. 205; Doc. 52-5, p. 4, ¶ 7). Ms. Moore could sit in a conference room in her building to wait for the day shift to clock out. (Doc. 52-3, p. 53, tpp. 205–06; Doc. 52-5, p. 4, ¶ 7). Ms. Moore was concerned about that option because it would cause her to clock in late. (Doc. 52-3, p. 53, tp. 206). Consequently, Phoenix offered to let Ms. Moore clock in on her cell phone so that she could avoid Ms. Fitzsimmons and avoid clocking in late. (Doc. 52-3, p. 53, tpp. 206–07; Doc. 52-5, p. 4, ¶ 7).

_____

[5] Ms. Moore disputes Ms. Langford's explanation for Phoenix's inability to provide video footage of her (Ms. Moore's) encounter with Ms. Fitzsimmons. In her deposition, Ms. Moore testified that when she cleans at night, she "can see the cameras rotate from room to room and go outside and come back inside." (Doc. 52-3, p. 48, tp. 188). But Ms. Moore conceded she does not know where the footage is displayed or whether anyone monitors or maintains the footage. (Doc. 52-3, p. 49, tp. 189).

After the June incidents and Ms. Moore's report to Phoenix, Ms. Fitzsimmons did not touch Ms. Moore, did not say anything inappropriate to her, and never again worked on the same crew with her.  (Doc. 52-3, pp. 58–59, tpp. 228–29).

Ms. Moore filed an EEOC charge on July 12, 2018.  In it, she alleged that Phoenix discriminated against her on June 12, 2018 on the basis of sex.  She reported that after Ms. Fitzsimmons touched her inappropriately on June 12, 2018, she reported the matter to three managers, and "they all tried to convince [her] to recant [her] story, but [she] did not."  (Doc. 52-6, p. 2).  Ms. Moore stated that she filed a police report against Ms. Fitzsimmons.  (Doc. 52-6, p. 2).  She asserted that Phoenix's conduct violated Title VII.  (Doc. 52-6, p. 2).

On August 31, 2018, Ms. Moore filed a retaliation charge with the EEOC. (Doc. 52-7, p. 2).  She asserted that, after she filed her July 12, 2018 EEOC charge, Phoenix had been slow to complete a DMV check for a lead position which she was pursuing and had been slow to answer questions about her time and attendance. (Doc. 52-7, p. 2).  Ms. Moore also reported that "Supervisor Ramos has instructed my Lead, Thomas Sawyer, to single me out for criticism, despite my team's 99.23% grade for the month."  (Doc. 52-7, p. 2).  Ms. Moore asserted that Phoenix's retaliatory conduct between July 12, 2018 and August 20, 2018 violated Title VII. (Doc. 52-7, p. 2).

On October 5, 2018, Ms. Moore was walking outside with a male co-worker. Ms. Fitzsimmons was outside too with a female co-worker. Ms. Fitzsimmons "looked at [Ms. Moore], and she whispered in the young lady's ear, and she immediately looked at [Ms. Moore], so [Ms. Moore] knew the conversation had to be about [her], 'cause [Ms. Fitzsimmons] didn't have a [sic] issue with the individual she was walking with." (Doc. 52-3, p. 54, tp. 211). Ms. Moore did not hear what Ms. Fitzsimmons said. (Doc. 52-3, p. 55, tp. 213). Ms. Moore "reported it, but nothing was done about it." (Doc. 52-3, p. 55, tp. 213).[6]

### III.

In her January 7, 2020 deposition, Ms. Moore testified that the June 8, 11, and 12 incidents and the October 5 incident were the only ones that she reported to Phoenix. (Doc. 52-3, p. 57, tpp. 221–23). When asked if there were "other incidents, other than those that occurred on those days," Ms. Moore testified: "[t]o the best of my ability, there are not, that I can think of. Too much time had passed to say yay [sic], nay." (Doc. 52-3, p. 57, tp. 223).

In her October 15, 2020 affidavit submitted in opposition to Phoenix's summary judgment motion, Ms. Moore recounted three additional interactions with

---

[6] Elsewhere in her deposition, Ms. Moore testified that she "tried to report that incident as well." (Doc. 52-3, p. 54, tp. 211). For purposes of summary judgment, the Court credits Ms. Moore's more favorable testimony that she reported the October 2018 incident, and nothing was done about it.

12

Ms. Fitzsimmons.  Ms. Moore wrote that on June 13, 2018, Ms. Fitzsimmons told her that she would buy her a Cadillac SUV or a Suburban.  On the same day, Ms. Moore heard Ms. Fitzsimmons refer to her as "her baby" while talking to a co-worker.  (Doc. 58, pp. 3–4, ¶ 17).  In her affidavit, Ms. Moore asserted that on June 15, 2018, Ms. Fitzsimmons called her through Facebook Messenger to ask why she (Ms. Moore) was leaving Ms. Fitzsimmons's team.  (Doc. 58, p. 4, ¶ 18).  In her affidavit, Ms. Moore stated that on August 9, 2018, she was outside when she caught Ms. Fitzsimmons "staring at [her] in a longing fashion from the passenger side of her mother's car."  (Doc. 58, p. 8, ¶ 41).  Ms. Moore wrote that she reported the August 9 incident to Phoenix and to the police, but nothing was done.  (Doc. 58, p. 9, ¶ 43).

Phoenix objects to the new information in Ms. Moore's affidavit because Ms. Moore's statements about events on June 13, June 15, and August 9 contradict her deposition testimony that her only encounters with Ms. Fitzsimmons occurred on June 8, 11, and 12 and October 5.  "[A] district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation."  *Bryant v. U.S. Steel Corp.*, 428 Fed. Appx. 895, 896 (11th Cir. 2011) (quoting *Van T. Junkins and Assocs. v. U.S. Indus.*, 736 F.2d 656, 656 (11th Cir. 1984)) (alteration in *Bryant*) (finding no abuse of discretion where district court disregarded a summary judgment affidavit

that contradicted the affiant's deposition testimony because the affiant did not provide a valid reason for the inconsistency).

Ms. Moore has not responded to Phoenix's objection; she has not attempted to explain why, when opposing Phoenix's summary judgment motion, she recalled three interactions with Ms. Fitzsimmons that she did not report in her deposition when asked for information about each of her interactions with Ms. Fitzsimmons. Phoenix's objection to the new information is grounded in precedent, but the Court will regard the objection as moot because Ms. Moore's description of the June 13, June 15, and August 9 incidents does not alter the Court's analysis of her hostile work environment and retaliation claims.[7]

---

[7] Though Ms. Moore has not responded to Phoenix's objection, the record contains a logical explanation for the additional information. In her deposition, Ms. Moore testified that she began keeping a journal after June 8, 2018. In it, she documented events relating to Ms. Fitzsimmons. (Doc. 53-2, pp. 42–43, tpp. 163–66). This seems to have been new information for counsel on both sides, and defense counsel asked Ms. Moore to provide the journal to her attorney. In her affidavit, Ms. Moore states that on June 8, 2018, she "began to keep journal notes of everything that happened to [her] while at Phoenix." (Doc. 58, p. 14, ¶ 73). The journal is part of Ms. Moore's evidentiary submission in opposition to Phoenix's motion for summary judgment and was available to Phoenix before it filed its objection to Ms. Moore's affidavit. (Doc. 60 (journal pages); Doc. 61 (Phoenix's objection to Ms. Moore's affidavit)). Ms. Moore documented the June 13, June 15, and August 9 incidents in her journal. (Doc. 60, pp. 6–7, 10, 38–39). Because she did not respond to Phoenix's objection, Ms. Moore has not taken the position that a review of the journal, which she did not have with her at her deposition, caused her to recollect the June 13, June 15, and August 9 incidents, but it stands to reason that the journal prompted her recollection of additional incidents.

The new information does not change the analysis below of Ms. Moore's hostile work environment claim for two reasons. First, the June 13 and June 15 incidents precede the remedial steps that Phoenix took, and, as discussed below, those steps were reasonably calculated to eliminate Ms. Fitzsimmons's harassing conduct. Viewing the evidence in the light most favorable to Ms. Moore, the August 9 incident represents new conduct to which Phoenix did not respond. The Court recognizes that the August 9 incident was upsetting to Ms. Moore, but the incident is not enough

# IV.

Ms. Moore's hostile work environment claim arises under Title VII.  Through Title VII, Congress prohibits "discriminat[ion] against any individual with respect to [her] terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  A Title VII violation occurs when "the workplace is permeated with [sexually] discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the terms and conditions of the victim's employment and create an abusive working environment."  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (second alteration in *Jones*) (quoting *Nat'l R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 116 (2002)).  Same-sex sexual harassment is actionable under Title VII.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998). [8]

---

to establish objectively that the harassment that she experienced was so severe or pervasive that it altered the terms and conditions of employment and created a discriminatorily abusive working environment.  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*) (explaining that a plaintiff in a hostile work environment case must show that the harasser's conduct was subjectively and objectively "severe or pervasive"); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (explaining that, in evaluating the objective component of the "severe or pervasive" test, a district court should consider the frequency of the conduct; the severity of the conduct; whether the conduct was physically threatening or humiliating or a mere offensive utterance; and whether the conduct unreasonably interfered with the plaintiff's work performance).

[8] In her second amended complaint, Ms. Moore alleges that the Court also has jurisdiction under 42 U.S.C. § 1981.  (Doc. 38, p. 2, ¶ 3).  Though Ms. Moore mentions in her second amended complaint that she is "a heterosexual African-American female," (Doc. 38, p. 2, ¶ 5; p. 3, ¶ 12; p. 7, ¶ 38), Ms. Moore brings her claims only under Title VII.  (*See* Doc. 38; Doc. 57, p. 1).  Accordingly, the Court regards her claims as Title VII claims.  Section 1981 governs discrimination claims based on race, so that statute is not available to Ms. Moore as a means to

To establish a *prima facie* hostile work environment claim, a plaintiff must show that:  (1) she belongs to a protected class; (2) she has been "subject[ed] to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature;" (3) the harassment was because of the plaintiff's sex; (4) "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;" and (5) she has "a basis for holding the employer liable."  *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)).

Ms. Moore has established the first three elements of her claim, and the Court will assume for purposes of this opinion that she can establish the fourth.  Even so, Ms. Moore's hostile work environment claim fails as a matter of law because she has not identified evidence that provides a basis for holding Phoenix liable for Ms. Fitzsimmons's conduct.

"[A]n employer's liability for . . . harassment may depend on the status of the harasser.  If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.  In cases in which the harasser is a 'supervisor,' however, different rules apply."  *Vance v. Ball State Univ.*,

---

seek relief based on hostile work environment allegations relating to same-sex harassment.  Ms. Moore has not asserted that Ms. Fitzsimmons or another Phoenix employee harassed her because she is African-American.

570 U.S. 421, 424 (2013).   "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if . . . she is empowered by the employer to take tangible employment actions against the victim[.]"  *Vance*, 570 U.S. at 424.

Phoenix characterizes Ms. Fitzsimmons as Ms. Moore's co-worker in its brief in support of its motion for summary judgment.  (*See* Doc. 53, p. 21).  In her opposition brief, Ms. Moore argues that Phoenix is liable under the co-worker standard, not the supervisor standard.  (*See* Doc. 57, pp. 21–23).  The record supports the parties' position.  The record demonstrates that Ms. Fitzsimmons was Ms. Moore's crew leader.  (Doc. 41, p. 4, ¶ 15).  Ms. Moore wrote to Phoenix that Ms. Fitzsimmons was her lead and that she was "in an extremely uncomfortable position complaining directly to her."  (Doc. 52-4, p. 2).  As crew leader, Ms. Fitzsimmons provided feedback to her supervisors, Robert Ramos and Roy Whitworth, on the performance of the employees in her crew.  (Doc. 52-3, pp. 24–25, 38, tpp. 91, 93, 145–46).  But Ms. Moore reported directly to Robert Ramos and Roy Whitworth, not to Ms. Fitzsimmons.  (Doc. 52-3, p. 14, tpp. 51–52).  There is no evidence that indicates that Ms. Fitzsimmons was authorized to take tangible employment actions against Ms. Moore.  Accordingly, the Court views Ms. Fitzsimmons as Ms. Moore's co-worker.

When the perpetrator of sexual harassment is a co-employee of the target of the harassment, "the employer will be held directly liable if it knew or should have

17

known of the harassing conduct but failed to take prompt remedial action." *Miller*, 277 F.3d at 1278 (citing *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000)).   "Thus, a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer." *Miller*, 277 F.3d at 1278 (citing *Breda*, 222 F.3d at 889).

Phoenix had actual knowledge of Ms. Fitzsimmons's harassment of Ms. Moore because Ms. Moore reported the conduct to Phoenix.   Therefore, Phoenix was obligated to take prompt remedial action.   The Eleventh Circuit Court of Appeals has explained that there is no "bright-line rule for promptness," but the Court of Appeals has found an employer acted promptly when it ordered an accused harasser not to be around the victim "immediately after her first complaint" and an investigator interviewed the accused harasser within six weeks of the complaint. *Wilcox v. Corr. Corp. of Am.*, 892 F.3d 1283, 1288 (11th Cir. 2018).   The employer's six-week delay in interviewing the alleged harasser did not support a hostile work environment claim because additional allegations against the alleged harasser surfaced, and the employer needed to interview 16 employees to explore the allegations.   *Wilcox*, 892 F.3d at 1288.   "Considering this entire succession of activity," the Court of Appeals wrote, the evidence did not show that the employer failed to act promptly.   *Wilcox*, 892 F.3d at 1288.

18

Ms. Moore notified Phoenix of Ms. Fitzsimmons's misconduct in June of 2018 a few days after the misconduct occurred. (Doc. 52-3, p. 41, tpp. 157–61; Doc. 53, p. 7, ¶ 32). Ms. Moore testified that in her initial meeting with Phoenix, Mr. Franklin attempted to convince her to recant or retract her statements regarding Ms. Fitzsimmons. (Doc. 52-3, pp. 49–50, tpp. 192–93). Even so, within two weeks, Phoenix moved Ms. Fitzsimmons to a different crew and another shift, investigated Ms. Moore's claim, and met with Ms. Moore several times. Phoenix offered alternative arrangements to Ms. Moore so that she could avoid Ms. Fitzsimmons. And Phoenix "repeatedly asked Ms. Moore to write a statement in her own words with anything Phoenix could do to make sure she ha[d] a safe work environment." (Doc. 64-1, p. 3, ¶ 7).

Ms. Moore argues that Phoenix failed to act promptly because nine months elapsed before Ms. Fitzsimmons "separated from service with Phoenix." (Doc. 57, p. 22). But Phoenix did not have to fire Ms. Fitzsimmons. An employer must select remedial action that is "'reasonably likely to prevent the misconduct from recurring.'" *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) (quoting *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir. 1990)). Ms. Moore concedes that Phoenix "attempted to separate her from Ms. Fitzsimmons, conducted an investigation and eventually, Ms. Fitzsimmons was moved to a different shift . . . ." (Doc. 57, p. 22). And Ms. Moore agrees that after she reported

Ms. Fitzsimmons's misconduct, Ms. Fitzsimmons did not touch her, did not say anything inappropriate to her, and never again worked on the same crew with her. (Doc. 52-3, pp. 58–59, tpp. 228–29).[9]

When Ms. Moore reported Ms. Fitzsimmons's misconduct in June of 2018, Phoenix acted quickly to remedy the situation. No evidence suggests that Phoenix did not take immediate action to stop the harassment as soon as the company became aware of Ms. Moore's allegations against Ms. Fitzsimmons. Accordingly, Ms. Moore may not hold Phoenix liable for Ms. Fitzsimmons's misconduct.[10] The Court will enter judgment for Phoenix on Ms. Moore's hostile work environment claim.

---

[9] In her affidavit and in her summary judgment opposition brief, Ms. Moore reports that several managers, including the company's vice-president, tried to dissuade her from complaining about Ms. Fitzsimmons and reporting Ms. Fitzsimmons's conduct to the EEOC. She also asserts that the remedy that Phoenix selected, moving her to a new team, created the appearance that she had done something wrong. Ms. Moore states that her new team lead was a friend of Ms. Fitzsimmons's, so she feared retaliation. (Doc. 57, pp. 5–7; Doc. 58, pp. 4–6). Ms. Moore's concerns do not alter the analysis of her hostile work environment claim. As noted, to hold Phoenix liable for Ms. Fitzsimmons's conduct, Ms. Moore must demonstrate that the company was negligent in its response to her complaints and failed to promptly address her concerns. Phoenix was not obligated to provide the exact remedy that Ms. Moore requested; the company had to take reasonable steps to eliminate the harassment. Ms. Moore has not demonstrated that Phoenix's efforts were unreasonable. Instead, she concedes that the company's efforts put an end to Ms. Fitzsimmons's harassment within days. Even if management tried to stop Ms. Moore from going to the EEOC, conduct that would be improper and might provide circumstantial evidence of retaliatory conduct, Ms. Moore's supervisors addressed and eliminated the harassing conduct that caused Ms. Moore to complain to them. That undisputed evidence prevents Ms. Moore from succeeding on her hostile work environment claim.

[10] As noted, Ms. Moore has described two incidents that post-date Phoenix's efforts to separate Ms. Moore and Ms. Fitzsimmons in June of 2018. One encounter occurred on August 9, when Ms. Fitzsimmons looked longingly at Ms. Moore, and the other occurred on October 5, when Ms. Fitzsimmons whispered to a co-worker as Ms. Moore walked by. Ms. Moore reported the incidents to Phoenix, but "nothing was done." (Doc. 58, p. 9, ¶¶ 41–43). As discussed, these incidents, that occurred two months apart, though disturbing to Ms. Moore, objectively are not conduct that was

# V.

Ms. Moore's retaliation claim falters too. "A plaintiff alleging retaliation in violation of Title VII 'must begin by establishing a *prima facie* case; the plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities.'" *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1244 (11th Cir. 2020) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997)). This evidence creates "a presumption that the adverse action was the product of an intent to retaliate." *Knox*, 957 F.3d at 1244 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)).

Ms. Moore says Phoenix retaliated against her after she reported Ms. Fitzsimmons's conduct to HR and filed her first EEOC charge of discrimination on July 12, 2018. (Doc. 37, pp. 8–9, ¶¶ 44–50). She contends that Phoenix was slow to respond to her allegations and "was slow to take any corrective action." (Doc. 37, p. 8, ¶ 46). According to Ms. Moore, the company's response "constructively encouraged complaints to be lodged against [her] work performance and work ethic for actions that were not even part of her job assignment." (Doc. 37, p. 9, ¶ 47). Ms. Moore also alleges that Phoenix denied her an annual uniform replacement. (Doc.

---

so severe or pervasive that it altered the terms and conditions of employment and created a discriminatorily abusive working environment.

37, p. 9, ¶ 49).  Finally, she states that Ms. Fitzsimmons's mother, another Phoenix employee, attempted to intimidate her by "unnecessarily plac[ing] herself in very close proximity to Ms. Moore when they would cross paths.  This intentional violation of her personal space caused Ms. Moore to feel anxious whenever it occurred."  (Doc. 37, p. 9, ¶ 50).

None of the conduct Ms. Moore describes rises to the level of an adverse employment action.  An adverse employment action occurs when "mistreatment 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  *Burlington N.*, 548 U.S. at 68 (citing 1 B. Lindemann & P. Grossman, EMPLOYMENT DISCRIMINATION LAW 669 (3d ed. 1996)).

Ms. Moore contends that her supervisor, Mr. Ramos, instructed her crew leader, Mr. Sawyer, to single her out for criticism.  (Doc. 52-3, p. 62, tpp. 244–45).  Mr. Sawyer obliged, telling her not to place wet floor mats on the counter and to stop using too much stainless-steel cleaner on water fountains.  (Doc. 52-3, p. 63,

tpp. 245–48).  None of the critiques resulted in write-ups, suspensions, or pay cuts. (Doc. 52-3, p. 63, tp. 247).[11]

"The reprimand of an employee does not constitute an adverse employment action when the employee suffers no tangible harm as a result." *Summerlin v. M&H Valve Co.*, 167 Fed. Appx. 93, 97 (11th Cir. 2006) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001)).   "Negative performance evaluations, standing alone, do not constitute adverse employment action, and courts are wisely reluctant to treat job performance memoranda as actionable . . . where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline." *Martin v. Eli Lilly & Co.*, 702 Fed. Appx. 952, 956 (11th Cir. 2017) (internal quotations and citations omitted).

---

[11] Ms. Moore acknowledges that "Mr. Ramos had a right to critique her performance" but says that he could not use Ms. Moore's co-workers to do his "dirty work." (Doc. 57, p. 24).  The evidence shows that Mr. Ramos, Ms. Moore's supervisor, asked Mr. Sawyer, the crew lead, to provide feedback.  Crew leads often discussed employee performance with supervisors.  (Doc. 52-3, p. 25, tp. 93).  Even viewing the evidence in the light most favorable to Ms. Moore, this appears a benign delegation of supervisory authority.  And Ms. Moore admits that she used too much stainless-steel cleaner.  (Doc. 52-3, p. 63, tp. 247).

In her affidavit and in her summary judgment opposition brief, Ms. Moore also stated that Mr. Ramos singled her out to perform additional cleaning and that Mr. Sawyer singled her out to perform tasks assigned to him.  (Doc. 57, pp. 12–13, ¶¶ 51, 53; Doc. 58, p. 10).  She did not expand on these assertions in her discussion of her retaliation claim, and she did not explain how the conduct constitutes an adverse employment action.  (Doc. 57, pp. 23–25).

Despite the criticisms from her supervisor, Ms. Moore received above average performance reviews in December 2018 and December 2019.  (Doc. 52-8, p. 6; Doc. 52-9, p. 6).[12]  Ms. Moore also concedes that she "received a pay increase after she filed both charges of discrimination and her lawsuit against Phoenix" but contends that "she was denied a promotion to a lead position."  (Doc. 57, p. 14, ¶ 60).[13]  Ms. Moore does not attribute the denial of a promotion to the verbal critiques her supervisors gave her.  The evidence in the record does not suggest that these informal critiques prevented Ms. Moore from becoming a team lead.  Because Ms. Moore suffered no tangible employment harm from the feedback, Mr. Sawyer's criticisms are not an adverse employment action.

The evidence also does not support Ms. Moore's argument that Phoenix's refusal to replace her uniforms was an adverse employment action.  "Phoenix has a policy that appearance is a must, and they don't like for [employees] to be around the customer with a stained uniform."  (Doc. 52-3, p. 22, tp. 81).  Phoenix's 2019 hourly employee personnel handbook explains that employees must keep uniforms "clean and present a proper appearance as defined by the project manager."  (Doc.

---

[12] Ms. Moore acknowledges receiving above average performance evaluations but argues that they "contained incorrect negative statements."  (Doc. 57, p. 14, ¶ 59).

[13] Though Ms. Moore, in her summary judgment opposition brief, mentions in her discussion of the summary judgment evidence that she applied for but did not receive a promotion to lead, (Doc. 57, p. 14), she did not include the unsuccessful promotion attempt in the list of adverse actions that she described in her discussion of her retaliation claim, (Doc. 57, pp. 23–25).

52-2, p. 7).  Though Ms. Moore asserts that the denial of new uniforms caused her to be "outside of the requirements set forth by management," (Doc. 57, p. 24), there is no evidence in the record that Ms. Moore was disciplined by management for the state of her uniform.  Moreover, the evidence does not indicate that the Phoenix employee tasked with uniform distribution was aware of Ms. Moore's complaints or EEOC charges.  (*See* Doc. 52-3, p. 70, tpp. 274–76).

Ms. Moore testified that her ability to get a new uniform could depend on whether Phoenix had enough uniforms for other employees who needed one.  (Doc. 52-3, p. 22, tpp. 82–83).  Operations manager Christy Langford explained that Ms. Moore requested new uniforms many times, but that Phoenix "does not have enough uniforms in inventory to issue new ones with each request."  (Doc. 52-5, p. 4, ¶ 8).  Phoenix had given Ms. Moore new uniforms several times and had denied her requests several times "but only because of the limited number of uniforms available.  Phoenix has not provided any other custodial employee with more new uniforms than it has provided to Ms. Moore."  (Doc. 52-5, p. 4, ¶ 8; *see also* Doc. 52-3, p. 71, tp. 277).[14]  Ms. Moore believes she was supposed to receive new uniforms on her work anniversary, either in December 2018 (when she had worked for Phoenix for one year), or April 2019 (one year after she completed her

---

[14] Ms. Moore confirms that she "received new uniforms on several occasions . . . but several of her requests were not filled."  (Doc. 57, p. 24).

probationary period).  (Doc. 52-3, p. 70, tp. 273).  Phoenix's 2019 hourly employee personnel handbook does not say that employees will receive new or additional uniforms on an annual basis.  (Doc. 52-2, p. 7).  Ms. Moore therefore provides no evidence that Phoenix's decision not to provide new uniforms in either December 2018 or April 2019 was an adverse employment action.

Finally, the evidence does not suggest that Ms. Moore's single interaction with Ms. Fitzsimmons's mother, Deborah Stone, constitutes an adverse employment action.  Ms. Moore recounted one interaction in which Ms. Stone followed her into the restroom and sat next to her in an adjoining stall.  (Doc. 52-3, p. 69, tp. 271). Ms. Stone "had already just [come] out of" the restroom, but when she saw Ms. Moore walk in, "[s]he turned back around" and followed her in.  (Doc. 52-3, p. 69, tp. 271).  Ms. Stone did not speak to her while they were in the restroom.  (Doc. 52-3, p. 69, tpp. 271–72).  Ms. Moore testified that Ms. Stone was an assistant supervisor, but Ms. Stone did not supervise Ms. Moore, and the two women worked in different zones on different shifts.  (Doc. 52-3, p. 69, tp. 270).  Phoenix CEO David Perez explained that Ms. Fitzsimmons's mother "has never had supervisory authority over Ms. Moore.  [She] does not have the authority to discipline Ms. Moore or evaluate her job performance.  [She] is not involved in any decisions regarding Ms. Moore's pay or status with Phoenix."  (Doc. 52-1, pp. 4–5, ¶ 6). The interaction with Ms. Stone does not rise to the level of an adverse employment action.

Ms. Moore has not provided evidence that she suffered an adverse employment action.[15]  Accordingly, because she cannot establish a *prima facie* case of retaliation, the Court will enter judgment in favor of Phoenix on her retaliation claim.[16]

## Conclusion

For the reasons stated above, by separate order, the Court will grant Phoenix's motion for summary judgment on Ms. Moore's claims.

**DONE** and **ORDERED** this September 28, 2021.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[15] In her summary judgment opposition brief, Ms. Moore relates an incident from April 2020 in which she "submitted a Phoenix MVR request form for her to drive her own private vehicle to and from the job site due to the COVID-19 pandemic." (Doc. 57, p. 14, ¶ 61). Phoenix issued Ms. Moore a Step 4 Discipline for falsifying a Phoenix record because it said she lied on her MVR form about her accident history. (Doc. 57, p. 15, ¶¶ 63–64). Ms. Moore acknowledges that Phoenix waived the discipline. (Doc. 57, p. 16, ¶ 68).

[16] Though the absence of an adverse employment action prevents Ms. Moore from presenting her retaliation claim to a jury, the Court emphasizes that it does not condone an employer's effort to discourage an employee from filing an EEOC charge. For the reasons discussed above, Ms. Moore's testimony that Phoenix managers tried to interfere with her effort to file an EEOC charge is not sufficient to create a jury question in this case, but on another record, this type of evidence could provide circumstantial evidence to support a Title VII claim.

27